IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs December 11, 2019

**STATE OF TENNESSEE v. WILLARD C. LAND**

**Appeal from the Circuit Court for Sequatchie County**
**No. 2015-CR-13     Justin C. Angel, Judge**

_____

**No. M2018-02121-CCA-R3-CD**

_____

In January 2015, the Sequatchie County Grand Jury indicted Defendant, Willard C. Land, for first degree premeditated murder.  Following a trial in February 2018, a jury found Defendant guilty of the lesser-included offense of second degree murder, for which Defendant received a sentence of thirty-five years' incarceration.  On appeal, Defendant contends that the trial court erred in admitting evidence of Defendant's prior threats and acts of violence against the victim and others, and he challenges the sufficiency of the evidence supporting his conviction.  Following a thorough review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and TIMOTHY L. EASTER, JJ., joined.

B. Jeffery Harmon, District Public Defender; and Vanessa King, Assistant District Public Defender, Jasper, Tennessee, for the appellant, Willard C. Land.

Herbert H. Slatery III, Attorney General and Reporter; Jonathan H. Wardle, Assistant Attorney General; Mike Taylor, District Attorney General; and Steve Strain and Sherry Shelton, Assistant District Attorneys General, for the appellee, State of Tennessee.

# OPINION

## Factual and Procedural History

*Trial*

### State's Case-in-Chief

Carolyn Bragg testified that the victim was her daughter, Kerry Summer Angel, and that the victim was twenty-four years old at the time of her death. She stated that the victim was engaged to Matt Harriger at the time of her death and that she last spoke to the victim around 7:15 p.m. on the evening of October 11, 2014, while the victim was at the home of Robert Kendall.

Robert Kendall testified that he lived on Keener Road in the Cagle Mountain area of Sequatchie County. Mr. Kendall explained that he met Defendant through Defendant's brother, who lived "two houses down." Mr. Kendall stated that he had been friends with both the victim and Defendant. Mr. Kendall testified that, on the day of the offense, Defendant and the victim were dropped off at his residence around 5:00 p.m. by Mr. Harriger. Mr. Kendall estimated that he had consumed around seven or eight beers before the offense occurred. He recalled that Defendant had also been drinking. He stated that the victim did not drink, was not intoxicated that evening, and seemed "normal." Mr. Kendall testified that he was sitting in his recliner in his living room when the victim grabbed his cordless telephone and walked out the front of the house, leaving Defendant inside the residence with Mr. Kendall.

Mr. Kendall stated that he later saw Defendant stab the victim in the back while they were in standing in his kitchen. Mr. Kendall testified that he "grabbed the phone and went outside dialing 911." Defendant then came out of the front door and walked down the street toward his brother's house. Mr. Kendall testified that he did not go back into his house until the police arrived and that he did not remove anything from the house. Mr. Kendall said that he did not see the victim with a weapon. Mr. Kendall denied that he was intoxicated at the time of the offense. The following exchange then occurred:

> [THE STATE]: Okay. Before you saw [Defendant] stab her, did you hear him say anything to, or did you hear [the victim] say anything?
>
> [MR. KENDALL]: Well, the only reason I turned around, I was in my living room . . . my kitchen is in behind me . . . I heard ["]Bill["] and that's when I seen (sic) that.

Mr. Kendall stated that, when he turned around, both the victim and Defendant were facing him, with Defendant behind the victim.

On cross-examination, Mr. Kendall agreed that the victim had been using his cordless phone "quite a bit" on the night of the offense and that he had told Defendant to "go out there and get [the] phone from her[.]" Mr. Kendall testified that, once police arrived, he was placed into the back of a patrol car and that, while in the car, he saw something that looked like "a white rabbit that disappeared[.]" He agreed that he told James Carney that he thought the white rabbit was a symbol of the victim's soul "disappearing."

James Carney testified that he lived on Keener Road about thirty to fifty yards from Mr. Kendall and that he was Defendant's half-brother. James Carney[1] recalled that, on the night of October 11, 2014, he was at home standing on his back porch when he heard "hollering . . . up towards [Mr. Kendall's] house." He called Mr. Kendall to ask him about "what was going on[,]" but Mr. Kendall said that he could not talk because he had to call 911. James Carney recalled that, about thirty minutes later, he saw Defendant walking through his back yard. Defendant asked him for a ride "off the mountain." Defendant told him that he had gotten into a fight with the victim and that the victim "pulled a knife on him[.]" Defendant said that he had stabbed the victim. James Carney told Defendant that he did not want to be involved and to get out of his yard, and Defendant left on foot. James Carney testified that he saw no injuries on Defendant. He acknowledged that he had been drinking on the night of the offense.

Deputy Danny Hall with the Sequatchie County Sheriff's Department testified that he was dispatched to Mr. Kendall's residence on Keener Road on the evening of October 11, 2014. Deputy Hall explained that he arrived at the residence about three minutes after he was dispatched. When he arrived, he saw Mr. Kendall standing inside the residence. Mr. Kendall came out of the residence as Deputy Hall approached the front door and entered the residence. Once inside, Deputy Hall found the victim lying on the floor deceased. Deputy Hall checked the rest of the residence and found no one else inside. Deputy Hall testified that there were no weapons around the victim. He agreed that Mr. Kendall appeared to have been drinking and described Mr. Kendall as "tore up and upset." Deputy Hall explained that, as part of standard police procedure, he placed Mr. Kendall in the back of his patrol car. Deputy Hall stated that Defendant was not at the scene.

---

[1] Because several witnesses share the same surname, we will use the witnesses' first names to distinguish between them. No disrespect is intended.

Travis Sherman, a constable for Sequatchie County, testified that he was dispatched to Mr. Kendall's residence on October 11, 2014, after the offense. Constable Sherman explained that he assisted deputies in looking for Defendant. He located Defendant by a gate that blocked off a cross street which connected Keener Road to Woods Road. Constable Sherman testified that Defendant was about seventy-five to one hundred yards from Keener Road. Constable Sherman exited his vehicle, called Defendant's name, and instructed him to get onto the ground. When another officer arrived, they took Defendant into custody. Constable Sherman testified that Defendant did not have any weapons on him at that time.

Officer Brian Walker with the Dunlap Police Department testified that he was employed as a deputy by the Sequatchie County Sheriff's Department in October 2014. On the evening of the offense, he was dispatched to the area near Keener Road to attempt to locate Defendant. Officer Walker stated that he located Defendant about twenty seconds after Constable Sherman. He said that Defendant was lying on the ground as directed by Constable Sherman, and he approached him and placed him in handcuffs. When Defendant asked Officer Walker what he was being arrested for, Officer Walker explained that he had been instructed to take Defendant into custody but that he was unsure of the charges. Officer Walker placed Defendant in the back of his patrol car and transported him to the sheriff's department. He had no further discussions with Defendant.

Investigator Jody Lockhart of the Sequatchie County Sheriff's Department testified that he responded to the crime scene on Keener Road on October 11, 2014. When he arrived, Investigator Lockhart noted that Mr. Kendall was in the back of Deputy Hall's patrol car and that the scene was roped off with yellow crime scene tape. Investigator Lockhart stated that he could smell alcohol on Mr. Kendall but that he did not appear to be intoxicated; he could answer every question asked of him. When Investigator Lockhart went inside the residence, he saw the victim lying in the fetal position on the kitchen floor. She had a small cut in her clothing on her back. Investigator Lockhart noted a pair of gray pants on the living room couch. Investigator Lockhart testified that officers found no weapons near the victim's body.

Investigator Lockhart recalled that he saw a partially open drawer in the kitchen. Inside the drawer, he found a silver steak knife with blood on it, which was later submitted to the crime lab. Investigator Lockhart noted that there was a blood smear between bags of dog food by the kitchen wall; there was also a puddle of blood at the base of the kitchen wall and a "concentrated" amount of blood near the victim. He testified that samples were obtained from each of these areas and that the samples were sent to the crime lab for forensic testing.

- 4 -

After finishing at the crime scene, Investigator Lockhart responded to the jail and attempted to speak to Defendant. He took swabs of Defendant's hands, collected Defendant's clothing, and photographed his body to document any injuries. Investigator Lockhart stated that Defendant had no visible injuries and that Defendant did not complain of any injuries. Investigator Lockhart recalled that, as he was swabbing Defendant's hands, Defendant stated, "I stabbed the b**ch, but I didn't mean to kill her. I love her." Defendant then asked Investigator Lockhart if the victim was still and alive, and Investigator Lockhart informed him that she was deceased. Investigator Lockhart testified that Defendant was seventy-two years old at the time of the offense; he was six foot two inches tall and weighed 195 pounds.

On cross-examination, Investigator Lockhart agreed that he described Mr. Kendall in a police report as "highly intoxicated[.]" However, Investigator Lockhart explained that Mr. Kendall was able to understand and answer questions. He testified that he found a purse on the couch in the living room, which contained three prescription pill bottles belonging to the victim. Investigator Lockhart agreed that there appeared to be a piece of tubing or a straw sticking out of the purse.

Deputy Chief Medical Examiner, Dr. Thomas Deering, testified that he performed the victim's autopsy the day following the offense. The victim was five foot four inches tall and weighed 128 pounds. Dr. Deering stated that an external examination of the victim's body revealed two "knife stab wounds" to the victim's back and a faint purple bruise to the left lower back. He described one stab wound as being located "basically in the center of the back" and said that the second stab wound was to the left side in the back. Dr. Deering agreed that the stab wound to the center of the victim's back had been the fatal wound. Dr. Deering explained that an internal examination showed blood in the left chest cavity. He stated that the knife used in the murder had fractured the victim's rib and then cut the aorta, the major vessel coming off the victim's heart. He stated that the incision in the aorta measured about a centimeter long. Dr. Deering estimated that the fatal stab wound would have required a "mild to a moderate amount of force[.]" Dr. Deering testified that the cause of the victim's death was multiple stabs wounds and that the manner of death was homicide.

Dr. Deering explained that he sent blood and urine samples from the victim to the lab for analysis. He stated that the toxicology report showed that the victim tested negative for alcohol but positive for marijuana, a muscle relaxer called Soma, Oxycodone, and Alprazolam and Benzodiazepines, which were anti-anxiety medications. He explained that Oxycodone was a narcotic that would relieve pain and make the user drowsy. He stated that there was "a lot" of Oxycodone in the victim's system, and he believed that the victim was "someone who [took] Oxycodone all the time." He stated that the drugs found in the victim's system were considered "downers."

On cross-examination, Dr. Deering acknowledged that his external examination of the victim showed that she had "multiple parallel linear scars along the left anterior forearm[,]" which appeared to be "signs of cutting or previous injuries[.]" He stated that the fatal stab wound traveled in a downward angle. Dr. Deering denied that potential side effects of Alprazolam included paranoid or suicidal ideation. He stated that individuals taking Alprazolam were generally "very sedate." Dr. Deering agreed that use of Alprazolam could impair memory and judgment, "[s]imilar to alcohol[.]"

Special Agent Mike Tubeville with the Tennessee Bureau of Investigation testified that he was the supervisor of the forensic biology unit. Agent Tubeville explained that he examined several items of evidence relating to Defendant's case. He stated that he tested three blood swabs taken from the crime scene and found that the swabs contained the victim's blood. He tested the knife blade found in the kitchen drawer and found that it contained human blood that was a match to the victim's DNA profile. Agent Tubeville stated that he tested the handle of the knife and found a combination of male and female DNA. The female DNA belonged to the victim; however, he was unable to determine if the male DNA belonged to Defendant because he did not have a DNA profile for Defendant. Agent Tubeville recalled that he tested Defendant's shirt and shoes, but they tested negative for blood. He stated, however, that Defendant's blue jeans tested positive for blood, which Agent Tubeville identified as the victim's.

### Jury-out Hearing

Prior to trial, the State filed a Notice of Intention to Use Prior Convictions to Impeach Defendant, asserting that Defendant had been previously convicted of voluntary manslaughter, possession of a Schedule II controlled substance for resale, sale of a Schedule II controlled substance, and fraudulently obtaining TennCare. Following the trial court's denial of Defendant's motion for judgment of acquittal at the close of the State's case-in-chief, the parties discussed the State's Notice, and the trial court determined that the State could introduce for impeachment purposes Defendant's conviction for fraudulently obtaining TennCare, if Defendant testified.[2] The trial court reserved ruling on the admissibility of Defendant's voluntary manslaughter conviction after the State asserted that the conviction was "a 404(b) issue or 404(a), depending on how you look at it" which the trial court could not address "until such time as [Defendant] testifie[d]."

---

[2] The State later conceded that the drug-related convictions were not admissible for impeachment purposes. Defendant does not challenge, on appeal, the admission of his conviction for fraudulently obtaining TennCare.

- 6 -

## Defendant's Testimony

Defendant testified that he had been previously convicted of TennCare fraud. He stated that he first met the victim in 2005, when she was fifteen years old and he was in his sixties. Defendant explained that the victim's mother "put her out," and he rented a trailer in Bledsoe County for himself, the victim, and the victim's boyfriend. Defendant explained that the victim moved out after she took his cell phone and "stayed gone for four days[.]" When the victim returned, Defendant took back his phone. The victim "started hitting [him]" and then "took a vase . . . and hit [Defendant] in the head" with it.

Defendant recalled that he began speaking to the victim again in 2010, when he was living with Mr. Kendall in Sequatchie County. Defendant and the victim would "hang out" and were together "most of the time. Maybe two to three weeks at a time[.]" Defendant testified that he had prescription medications for Morphine, Oxycodone, Xanax, and Soma, which were prescribed for back pain. Defendant stated that, if he did not give his medications to the victim, she would become "violent" with him. He stated, "She would be hitting me . . . if she didn't have her way she'd just go off[.]" He recalled that, sometime between 2010 and 2014, he moved to California for four or five months. Then, the victim contacted him and told Defendant that she loved him and wanted him to return to Tennessee. Defendant explained that the victim also promised that she would go to drug rehabilitation but that she never attended rehab after he left California.

Defendant testified that the victim had mental health issues and that he had taken the victim to see doctors at Johnson Mental Health. Defendant stated that there were many times when the victim was aggressive and violent towards him. He said that, when he returned from California, he lived with the victim "for a while," but she "got real bad . . . taking too many drugs[.]" Defendant said that he eventually moved to Chattanooga to get away from the victim. He testified that, while in Chattanooga, he lived with a friend, Connie Mitchell, at her condominium. Defendant recalled a time when the victim visited him in Chattanooga. He stated that the victim wanted to "stab" Defendant's cousin and that the victim jumped on Defendant and hit him. He testified, "[The victim] jumped on me, and I told her . . . this is [Ms. Mitchell's] apartment, she don't want . . . nothing (sic) like that here[.]" Defendant stated that the police were called to Ms. Mitchell's condo multiple times but that he never pressed charges against the victim. He stated that the victim wanted to be "more than friends" but that he told her no.

Defendant testified that the victim would become angry quickly and that he had seen her be violent towards others. Defendant stated that the victim fought Jeremiah Underwood at a trailer park in Sequatchie County and that Defendant broke up the fight. Defendant testified that the victim also "got into it a little bit" with his cousin, Jamie Brady, and that he had to break up this fight, too. He recalled that the victim got into

fights with older women, including Mary Ann Hunt. Defendant recalled an occasion when the victim accompanied him to pay back $30 that he owed to Ms. Hunt's son. Defendant said that the victim was angry because she thought that the money was "suppose[d] to be hers." At one point, Ms. Hunt asked the victim to be quiet, and the victim grabbed Ms. Hunt's arm, which at the time was broken, and pulled Ms. Hunt out of the way.

Defendant recalled that he and the victim saw each other on his birthday, October 7, 2014. When the victim called Defendant the following day, he told the victim, "I'm going to be honest and truthful with you . . . I'm a good friend, but I don't want to be bothered no more . . . I can't take this." Defendant testified that, a few days later, he went to the doctor to get refills on his prescription medication, specifically Hydrocodone, Xanax, and Soma. The victim called him several times after he left the doctor's office; she wanted to meet with Defendant, but he told her that he did not want "to be bothered." Fifteen minutes later, Mr. Harriger called Defendant. Defendant told Mr. Harriger not to bring the victim to his house and that he did not want to see her. Defendant testified, however, that Mr. Harriger and the victim showed up at Defendant's residence in Snuff Hollow, where Defendant was living with a friend. Defendant stated that he did not want there to be any trouble at his friend's home, so he agreed to go with Mr. Harriger and the victim. He explained that the victim had a $60 check to cash and that, after cashing the check, the victim gave him $45. Defendant recalled that, from there, Mr. Harriger drove Defendant to Bledsoe County to pick up $30 from a friend, Tate, who owed Defendant money. Mr. Harriger then drove Defendant to see another person who owed Defendant $100, and Defendant collected the money. At that point, Mr. Harriger told Defendant that he was going home, and he dropped off Defendant and the victim at Mr. Kendall's residence.

Defendant recalled that Mr. Kendall was "highly drunk[.]" He testified that the victim used Mr. Kendall's cordless phone and stayed outside speaking on the phone. Defendant said that Mr. Kendall asked him to take the phone away from the victim and that, when he did, the victim "just went off." The victim began "hollering[.]" Defendant recalled that his nephew, Patrick Carney, brought Defendant some beer. The victim told Defendant several times that she wanted his pills. Defendant gave the victim the pills because she was "high, [and] she needed something to calm her nerves."

Defendant testified that he and the victim walked to Mr. Harriger's residence. While there, he called a friend named Tate and asked Tate to give him a ride home. Defendant stated that, when he got ready to return to Mr. Kendall's house, the victim threatened to hit him with a beer bottle. Defendant asked Mr. Harriger to keep the victim at Mr. Harriger's house, and Defendant began walking back to Mr. Kendall's house. He

stated that, as he was walking, Mr. Harriger pulled up and told Defendant to get in his truck.  Mr. Harriger then took Defendant to Mr. Kendall's house.

Defendant stated that, when he arrived at Mr. Kendall's house, the victim was there.  Defendant questioned the victim about why she did not stay with Mr. Harriger, and the victim said, "I told you you're going to stay with me till the 16th."  Defendant explained that October 16 was when Mr. Harriger was going to get his Oxycodone pills.  Defendant stated that he again attempted to contact Tate to get a ride home.  Defendant explained that the victim told him, "You're not going anywhere.  You're going to stay with me."  The victim took off her pants and tried to get Defendant to have sex with her, but he declined.  When Tate returned his phone call, the victim "went off" and began "hollering in [Defendant's] ear[.]"  Defendant told Tate, "Please, come," and Defendant hung up the phone.  He then sat down on the couch and began talking to Mr. Kendall, and the victim got on the phone in the kitchen.  Defendant explained that he did not argue with the victim and that he tried "to calm her down."

Defendant testified that he decided to go outside to smoke a cigarette.  As he walked through the kitchen towards the back door, the victim stopped him and asked where he was going.  Defendant said that he was going outside to smoke, but the victim said, "I told you you wasn't (sic) going anywhere."  When Defendant said that he was going home, the victim pushed him, and he stumbled in the kitchen.  Defendant testified, "I didn't really fall, I was stumbling . . . .  I stumbled and caught myself."  Defendant stated that the victim had a knife and that she raised her arm and "came at" Defendant.  Defendant testified that he thought the victim was going to kill him, so he found a knife in the kitchen sink and picked it up.  Defendant testified that the victim came at him and hit him.  He "threw [his] hand up" and "came down" with the knife in an overhand motion, stabbing the victim.  Defendant said that the knife the victim was holding "went out of her hand" and hit the wall.

Defendant stated that he was "in shock" after stabbing the victim and that he must have put his knife in the kitchen drawer but did not recall doing so.  Defendant stated that the victim was still standing when he left the kitchen and went outside.  Defendant testified that he told Mr. Kendall, "You call 911, you g[e]t the ambulance up here, the[re] ain't (sic) nothing I can do."  Defendant stated that he went to his brother's residence and that he did not stay at the crime scene because he was in shock.  Defendant asked his brother for a ride and told him that he and the victim "pulled knives on each other."  Defendant denied that he was trying to flee the scene and denied that he called the victim a "b**ch" when informed of her death.  Defendant said that he weighed only 145 pounds at the time of the offense.

- 9 -

## Jury-out Hearing

In another jury-out hearing following Defendant's direct examination testimony, the trial court determined that Defendant's conviction for voluntary manslaughter should not be admitted into evidence because the probative value was outweighed by the danger of unfair prejudice. The State then requested that it be allowed to introduce "evidence [Defendant] has made threats to kill several other persons" as the evidence was "applicable to the issue of first aggressor[.]" The State argued:

> I also printed off [Rule] 404, which the comment in 404 from the advisory commission, 2009, and it states that the accused and past character of the alleged victim amended Rule 404(a)(1), allows the prosecution to prove the accused character[] with the same trait. This is an additional way the accused opens the door to character evidence. The State would submit under these circumstances that is exactly what he has done by claiming she's the aggressor. I think that opens the door . . . .

The following colloquy then occurred:

> [DEFENSE COUNSEL]: . . . [C]orroboration evidence in these first aggressor cases, not substantive evidence, does not go under 404 or 405, that it's merely to show [Defendant's] state of mind, and I don't know if the [c]ourt noticed, I was careful in my questioning not to have [Defendant] testify in the form of opinion or reputation, which gets you into 404(a). I didn't bring up his reputation -- I mean, his -- yeah -- saying that I'm a calm person, peaceful person, didn't go there. Likewise, I never asked him, based on the community, what they're saying, what you've heard, have you formed a reputation as to her opinion for violence, nor did I ask based on your own knowledge of this person and relationship do you have an opinion as to [the victim's] character for peacefulness or violence. Did not go there, and I made sure I didn't. I'm saying everything he talked about, and any proof we're going to put on later, as well, of the other fights she'd been in under the -- I don't know if you pronounce it Ruane, R-U-A-N-E, and the supporting cases that I put in with that, I think they clearly indicate this is not 404 character evidence, and that's my position. That's why the State can't go into it, we never went there.
>
> THE COURT: Well, [Defendant] did testify that he does not like to fight, and he also testified that he was trying to evade or avoid a confrontation with the deceased.

- 10 -

[DEFENSE COUNSEL]: [Defendant] did mention on specific occasions telling [the victim] . . . I don't want to fight with you. Talking about some of the, we'll call them confrontations in the past, I don't think that gets him to the place where he is putting his own character at issue. I think he's just relating, for context, what happened on those particular occasions. I don't think he went into his character.

. . . .

I think under 404(a), if we had opened the door as to his character for peacefulness or her character or reputation, you know, like through opinion or reputation, because if you look, [Rule] 405 tells you what to do if this comes in under 404. [Rule] 405 tells you how it's to be done. Character, reputation, or you can then cross-examine as to specific acts if you've done character or reputation. We didn't, so I don't think this will come in either.

. . . .

[THE STATE]: . . . [Defense counsel] is trying to characterize first aggressor is not character, exactly what he's talking about. She's aggressive towards me, she kept attacking me, et cetera, et cetera. That falls under 404. I mean, I think he's trying to say I can get up there and say all these things about the victim, that she's aggressive, and she's the first aggressor, but that's not character. Well, that's exactly what it is, so we would submit it comes in.

Defense counsel responded:

[T]he State can rebut under 404(a) if we offer evidence of either [Defendant's] peacefulness or her lack of peacefulness . . . through character or reputation if we have opened the door, and I'm still saying I don't think we've opened that door. We've offered it purely to corroborate his state of mind.

The trial court then stated:

The [c]ourt ruled to keep the manslaughter conviction out, because I felt it was way too similar to the charge here today. However, . . . Defendant did testify on the stand as to at least one incident where he did not want to fight, and he is also alleging self-defense in asserting that the

- 11 -

deceased was the initial aggressor, and the State is now seeking to introduce threats made by . . . Defendant to other people, which would essentially, I guess, could be inferred that he is aggressive. If he's making threats to hurt people, or kill people, that he could be perceived as an aggressor.

. . . .

And so because of the self-defense assertion made by [Defendant], I will allow the State to go into that testimony, that evidence as far as threats of violence made by [Defendant], and then the specific acts of violence between [Defendant] and the [victim] that [Defendant] testified to on the stand, I believe he opened the door to cross-examination on those points.

Additional Defense Proof

On cross-examination, Defendant acknowledged that he had sex with the victim when they lived in Bledsoe County and another time in 2011. Defendant stated that he had not worked in "about [twenty] years" and that he lived on $720 in benefits that he received monthly. Defendant denied that the victim bought pills from him. He said that the $45 she paid him was because "she owed [him] money." Although he denied selling pills, Defendant agreed that he gave the victim all three types of his pills. He agreed that, on the evening of the offense, the victim had "gotten into [his] pills and given those to [Mr. Harriger.]" Defendant testified that he asked Patrick Carney for a ride home on the night of the offense but that he said he could not give Defendant a ride because the vehicle he was using "wasn't his car." Defendant said that he stabbed the victim "in the back" and agreed that the wound that killed her was the first stab wound. Defendant claimed that he only stabbed the victim one time. He explained, "Yeah, but when I stabbed her I brought the knife up, and it might have sliced when she moved back. I didn't stab twice." He denied telling the victim that he was going to kill her before he stabbed her, and he denied that he tried to hide the knife in the kitchen drawer after the stabbing. Defendant stated that he feared for his life and that he was defending himself. Defendant denied that he and the victim were arguing about pills before the stabbing occurred. He agreed that he had broken up fights between the victim and other people, stating, "I had to fight to keep two or three boys off of her[.]"

Defendant acknowledged an incident in which he broke the windshield on the victim's car after she hit him with a rock. He stated, however, that the victim was not in the car at the time. Defendant agreed that he was arrested and charged with vandalism following the incident. Defendant denied that he had ever "pulled a knife" on Mr.

- 12 -

Kendall and threatened to kill him. He further denied ever threatening to kill Detective Lockhart.

Benjamin Biller, a licensed senior psychological examiner, testified as an expert in the field of psychology. Mr. Biller stated that he did not examine or treat the victim, but he reviewed her mental health records. He explained that the victim had been previously diagnosed with the following: Schizoaffective Disorder Bipolar Type; Attention Deficit Disorder; Attention Deficit Hyperactivity Disorder; Panic Disorder; Anxiety Disorder; Generalized Anxiety Disorder; Paranoia; Polysubstance Disorder; Bipolar Disorder; Nerve Disorder; Borderline Personality Disorder; Posttraumatic Stress Disorder; Mood Disorder NOS; and Eating Disorder. Mr. Biller stated that the diagnosis of Borderline Personality Disorder meant that the victim had shown a "pervasive pattern of instability . . . [in] interpersonal relationships," marked impulsivity, and "[e]fforts to avoid abandonment[.]" He explained that Polysubstance Disorder meant that the victim was abusing illegal substances or prescription medications. He stated that with her diagnosis of Bipolar Disorder, the victim would have "instability of mood" and act in an impulsive manner at times. Mr. Biller noted that the victim's mental health records indicated that the victim was "always angry, agitated, yell[ed] and [threw] things" and that she "hit[] men in her life." Further, he stated that the records indicated that the victim "had identified thoughts of killing people that have hurt her, but denie[d] intents."

On cross-examination, Mr. Biller read from several portions of the victim's medical records. In one note from June 12, 2008, the victim's therapist indicated that the victim was not suicidal or violent. Another note from February 11, 2009, reported that the victim had "no current thoughts of harm to self or others." Likewise, on May 3, 2012, the victim's therapist noted that the victim was in no danger of harming herself or others. On October 8, 2013, December 31, 2013, February 1, 2014, March 1, 2014, and May 6, 2014, the therapist again indicated that the victim was not suicidal, homicidal, or violent. Mr. Biller acknowledged that the victim had never been judicially committed. On redirect, Mr. Biller stated that the record which indicated that the victim "hit[] men in her life" was from May 2012. He stated that this type of behavior would have been a "persisting pattern" in the victim's life based on her diagnoses.

Connie Mitchell testified that she lived in Chattanooga and met Defendant through her ex-husband. Ms. Mitchell explained that Defendant stayed with her at her condo for about a year and a half and that she met the victim through Defendant. Ms. Mitchell stated that she had seen the victim and Defendant argue many times. Ms. Mitchell said, "I've seen [the victim] get so angry that she would hit at [Defendant] . . . ." She stated that the victim would "swing at" Defendant, and Defendant would try to calm her down and deescalate the situation. Regarding their relationship, Ms. Mitchell stated that it was

"kind of confusing" and that Defendant would call the victim his girlfriend, but the victim would say that "she loved [Defendant] like a grandfather[.]"

Patrick Carney testified that he was Defendant's nephew. He explained that he stopped by Mr. Kendall's on the day of the offense and spoke to the victim and Defendant. He then went to a market and purchased beer for Defendant. When he returned to Mr. Kendall's with the six-pack, the victim and Defendant were arguing out in the yard. The victim had pills and a phone and was "walking back and forth" and "[t]rying to make calls[.]" Patrick Carney recalled that the victim looked pale and had bloodshot eyes. He explained that he went home, and later that night, he overheard Defendant speaking to his father. Defendant asked his father, James Carney, for a ride, but Defendant was told "to get off our property." On cross-examination, Patrick Carney testified that, if Defendant had asked him for a ride home, he would have given Defendant a ride.

Shelley Smith testified that, about a month before the victim's death, she met the victim at a gas station on Cagle Mountain. Ms. Smith had given a friend, Latasha LeCruz, a ride to the gas station. When they arrived at the gas station, Ms. LeCruz went inside; four or five minutes later, Ms. LeCruz came out of the store with the victim behind her "throwing her arms and going on." The victim was cussing at Ms. LeCruz, and she grabbed the back of Ms. LeCruz's hair. The victim pulled her hair and "swung at her[,]" and then Ms. LeCruz began fighting with the victim. Ms. Smith said that she, Mr. Harriger, and another guy broke up the fight. The victim then began beating on the window of Ms. Smith's car. Ms. Smith told the victim, "I don't have a beef with you, enough is enough[,]" and she and Ms. LeCruz left the gas station. Ms. LeCruz had a "busted lip," a bloody nose, and red marks on her face and neck. On cross-examination, Ms. Smith agreed that the victim did not have a weapon during the fight with Ms. LeCruz and that they did not report the incident to police.

Brenton Letchworth testified that he had been previously convicted of several aggravated burglaries and that he was currently incarcerated due to a violation of probation. Mr. Letchworth testified that he used to work at a gas station called Laura's Market, where he often saw the victim. Mr. Letchworth stated that the last time he saw the victim was the morning before she died. The victim was in the parking lot arguing with Mr. Harriger, and Mr. Letchworth's boss had him remove the victim from the premises. He stated that the victim was "highly upset" and "erratic." Mr. Letchworth agreed that the victim and Mr. Harriger were arguing but that there was no physical violence.

Martha Carney testified that Defendant was her uncle. She stated that, the morning after the victim's death, she went to her parents' house on Keener Road. Mr.

Kendall was there, and he asked her to clean his kitchen and offered to pay her $50. Ms. Carney agreed and accompanied Mr. Kendall back to his house. She testified that Mr. Kendall was intoxicated. While she was cleaning the kitchen, Mr. Kendall remained on his porch. Ms. Carney testified that, as she cleaned up the blood from the kitchen floor, she moved several bags of dog food that had been placed up against the kitchen wall. When she moved the dog food, she saw a knife. Ms. Carney described the knife as having a black handle and being about the same length as her hand. Ms. Carney said that she told Mr. Kendall about the knife, and he told her to throw it away, which she did. Ms. Carney testified that she eventually told her parents about finding the knife, but she never reported her discovery to police. She agreed that the first time the authorities were learning about the knife was during her testimony.

### State's Rebuttal Proof

Detective Jody Lockhart testified that, following a court appearance several years ago, Defendant threatened his life. He stated that he spoke to Ms. Carney a week before Defendant's trial. During their discussion, Ms. Carney stated that she intended to testify as a character witness for Defendant. She never said anything to Detective Lockhart about having located a knife in Mr. Kendall's residence. Detective Lockhart stated that Mr. Kendall's residence had been thoroughly searched by authorities for three hours. He said that they looked carefully around the bags of dog food, and they found nothing in the space between the bags of dog food and the wall. He testified, "We checked all areas. We did not find any weapons[.]" On cross-examination, Detective Lockhart agreed that there was a gap between the refrigerator and the wall and that one of the bags of dog food was in front of the gap. Detective Lockhart agreed that there were other black-handled knives in the kitchen drawer. He further agreed that, after Defendant threatened him, Detective Lockhart responded to Defendant, "You ain't the only crazy son-of-a-b**ch with a gun[.]"

Following deliberations, the jury found Defendant guilty of the lesser-included offense of second degree murder. At a sentencing hearing conducted April 18, 2017, the trial court sentenced Defendant, as a multiple offender, to serve thirty-five years in the Tennessee Department of Correction.

Defendant filed an amended[3] motion for new trial on September 26, 2018. Following a hearing, the trial court filed a written order denying the motion for new trial on October 22, 2018. This appeal follows.

---

[3] According to Defendant, he filed a timely motion for new trial on May 11, 2017; however, the motion is not included in the record on appeal. In its brief, the State notes Defendant's failure to include the original motion for new trial in the record but asserts that the State "does not here contest the timeliness of the motion."

## Analysis

### *Admission of prior threats and acts of violence*

On appeal, Defendant asserts that the trial court erred in allowing the State to "question Defendant regarding alleged acts of violence in his past against the victim and others." Defendant argues such evidence was inadmissible because he did not put the victim's character at issue when he introduced evidence of her violent acts "for the purpose of proving [Defendant's] fear of the victim and his state of mind." Defendant contends that he only testified about the victim's prior violent acts to prove he had a reasonable fear when she wielded the knife. Defendant argues that by allowing the jury to hear "the irrelevant and improper evidence" regarding Defendant's alleged threats and acts "more than likely affected the verdict" and was not harmless.

The State responds that it presented limited evidence regarding Defendant's prior threats and acts of violence to rebut evidence that Defendant presented about the victim's violent tendencies and that the trial court did not abuse its discretion in admitting the evidence.

When a trial court makes an evidentiary ruling, the appropriate standard of review on direct appeal is "whether the record clearly demonstrates that the trial court abused its discretion in ruling the evidence inadmissible." *State v. McCaleb*, 582 S.W.3d 179, 186 (Tenn. 2019) (citing *Regions Bank v. Thomas*, 532 S.W.3d 330, 336 (Tenn. 2017); *State v. Davis*, 466 S.W.3d 49, 61 (Tenn. 2015)). In *McCaleb*, our supreme court explained:

> We emphasize that the abuse of discretion standard of review does not permit an appellate court to substitute its judgment for that of the trial court. *State v. Harbison*, 539 S.W.3d 149, 159 (Tenn. 2018). Rather, "[b]ecause, by their very nature, discretionary decisions involve a choice among acceptable alternatives, reviewing courts will not second-guess a trial court's exercise of its discretion simply because the trial court chose an alternative that the appellate courts would not have chosen." *White v. Vanderbilt Univ.*, 21 S.W.3d 215, 223 (Tenn. Ct. App. 1999). Accordingly, if the reviewing court determines that "reasonable minds can disagree with the propriety of the decision," the decision should be affirmed. *Harbison*, 539 S.W.3d at 159.

*Id.*

Tennessee Rule of Evidence 404(a)(2) states generally, "Evidence of a person's character or trait of character is not admissible for the purpose of proving action in

conformity therewith on a particular occasion, except: . . . [i]n a criminal case, . . . evidence of a pertinent trait of character of the alleged victim of the crime offered by an accused[.]" Tenn. R. Evid. 404(a)(2). Generally, this provision is used to present evidence of the victim's previous history of violence to show that the victim was the first aggressor. *See State v. Ruane*, 912 S.W.2d 766, 779 (Tenn. Crim. App. 1995), *abrogated on other grounds by State v. Williams*, 977 S.W.2d 101, 105 (Tenn. 1998); *see also* NEIL P. COHEN ET AL., TENNESSEE LAW OF EVIDENCE § 4.04[5][f] (6th ed. 2011). Pursuant to Tennessee Rule of Evidence 405(a), however, this substantive evidence may be established only by reputation or opinion, and specific acts may be inquired into only on cross-examination. Tenn. R. Evid. 405(a).

As amended in 2009, Tennessee Rule of Evidence 404(a)(1) provides that, if evidence of a trait of character of the victim of the crime is offered by the defendant and admitted under Tennessee Rule of Evidence 404(a)(2), the State may offer "evidence of the same trait of character of the [defendant][.]" Tenn. R. Evid. 404(a)(1). The Advisory Commission Comment relating to the amendment reads, "If the accused attacks the character of the alleged victim, amended Rule 404(a)(1) allows the prosecution to prove the accused's character for the same trait. This is an additional way the accused 'opens the door' to character evidence." *Id.*; *see e.g., State v. Bendale Romero*, No. E2015-00860-CCA-R3-CD, 2016 WL 3437166, at *7 (Tenn. Crim. App. June 15, 2016) (finding that the trial court did not err when it held that the defense witness's testimony regarding prior acts of the victim would "open the door" for the State to offer evidence of the Defendant's character for violence), *perm. app. denied* (Tenn. Oct. 19, 2016); *State v. Pamela Taylor*, No. W2012-02535-CCA-R3-CD, 2014 WL 4922629, at *45 (Tenn. Crim. App. Sept. 30, 2014) (finding that the defendant, after presenting specific acts of violence by the victim to support her first aggressor theory, "'opened the door' to proof of her character when she presented evidence that the victim was the first aggressor and that she had acted in self-defense when she fatally shot the victim"), *perm. app. denied* (Tenn. Jan. 15, 2015); *State v. Jason Allen Cobb*, No. W2011-02437-CCA-R3-CD, 2013 WL 1223386, at *13 (Tenn. Crim. App. Mar. 26, 2013), *perm. app. denied* (Tenn. Oct. 16, 2013). The State may present rebuttal proof of the defendant's character in the form of reputation or opinion testimony. Tenn. R. Evid. 405(a); *Pamela Taylor*, 2014 WL 4922629, at *45. Additionally, the State may cross-examine witnesses about specific instances of conduct if the following conditions are satisfied:

> (1) [t]he trial court *upon request* must hold a hearing outside the jury's presence, (2) [t]he court must determine that a reasonable factual basis exists for the inquiry, and (3) [t]he court must determine that the probative value of a specific instance of conduct on the character witness's credibility outweighs its prejudicial effect of substantive issues.

Tenn. R. Evid. 405(a) (emphasis added); *see also Pamela Taylor*, 2014 WL 4922629, at *45-46.

On direct examination, Defendant testified about the victim's violent tendencies, as well as numerous specific instances in which the victim was violent. Specifically, Defendant testified that:

> 1. The victim hit him in head with a vase;
>
> 2. The victim would become violent and hit Defendant if he refused to give her pills;
>
> 3. The victim was violent, easily angered, and became aggressive with Defendant many times;
>
> 4. Defendant saw the victim try to stab Defendant's cousin in Chattanooga, and then the victim jumped on Defendant and hit him;
>
> 5. Defendant witnessed the victim fighting with Mr. Underwood and defendant's cousin; and
>
> 6. Defendant saw the victim violently pull on the broken arm of an older woman.

Defendant then testified that, on the evening of the offense, the victim came at him with a knife. Defendant said that he thought the victim was going to kill him and that he acted in self-defense when he stabbed her.

The State did not object to Defendant's testimony about the victim's prior violence, but after Defendant's testimony on direct, the State sought permission to introduce evidence of Defendant's prior violent acts against the victim and evidence that he had threatened to kill people. Defendant objected, arguing that his testimony was merely "corroboration evidence" and not subject to Rule 404(a). He noted that he had not testified as to the victim's reputation or offered his testimony in the form of an opinion as specified by Rule 405(a). The trial court ultimately ruled:

> Defendant did testify on the stand as to at least one incident where he did not want to fight, and he is also alleging self-defense in asserting that the deceased was the initial aggressor, and the State is now seeking to introduce threats made by . . . Defendant to other people, which would essentially, I guess, could be inferred that he is aggressive. If he's making

- 18 -

threats to hurt[] people, or kill people, that he could be perceived as an aggressor.

. . . .

And so because of the self-defense assertion made by [Defendant], I will allow the State to go into that testimony, that evidence as far as threats of violence made by [Defendant], and then the specific acts of violence between [Defendant] and the [victim] that [Defendant] testified to on the stand, I believe he opened the door to cross-examination on those points.

On cross-examination, the State questioned Defendant about three specific instances of conduct. Specifically, the State asked Defendant about breaking the victim's windshield, and Defendant agreed that the incident occurred but stated that the victim hit him with a rock first and that the victim was not in her car when he broke the windshield. The State then asked Defendant about pulling a knife on Mr. Kendall and threatening to kill him, and Defendant denied that this occurred. Finally, the State questioned whether Defendant ever threatened to kill Detective Lockhart, which Defendant denied.

Following Defendant's testimony, the defense put on additional proof of victim's violent tendencies, including testimony from Mr. Biller regarding the victim's mental health issues and that the victim was "always angry, agitated, yell[ed] and [threw] things" and "hit[] men in her life." Ms. Mitchell testified that she observed the victim become angry and try to hit Defendant. Ms. Smith testified about an incident in which the victim grabbed Ms. LeCruz's hair and fought her at a gas station, and Mr. Letchworth testified about an incident at the gas station when the victim was fighting with Mr. Harriger and was asked to leave the premises. In rebuttal, Detective Lockhart testified that Defendant had threatened his life following a court appearance several years ago.

We agree with the trial court's determination that Defendant's lengthy direct examination testimony regarding the victim's violent tendencies and numerous specific instances in which the victim was violent towards Defendant and others was evidence of the victim's character for violent behavior to help establish that the victim was the aggressor, which opened the door for the State to offer evidence of "the same trait of character of the accused[.]" Tenn. R. Evid. 404(a)(1). Just because Defendant, in the absence of an objection from the State, did not limit his testimony to the victim's reputation or to the form of an opinion as required by Rule 405(a), does not mean that his testimony did not amount to character evidence. A noted authority has observed that "the use of specific acts [of the victim] to prove first aggression is character proof of the victim's propensity for violence." *Ruane*, 912 S.W.2d at 780 (quoting NEIL P. COHEN ET AL., TENNESSEE LAW OF EVIDENCE § 404.4 (2d ed. Supp. 1994)) (internal quotation

- 19 -

marks omitted); *see also State v. Martin Stuart Hammock*, No. M2000-00334-CCA-R3-CD, 2001 WL 1218584, at *8 (Tenn. Crim. App. Oct. 12, 2001).

We note, however, that before allowing the State to inquire on cross-examination about specific instances of Defendant's violent conduct, the trial court failed to determine that a reasonable factual basis existed for the State's inquiry and failed to determine that the probative value of the specific instances of conduct outweighed the prejudicial effect on substantive issues. *See* Tenn. R. Evid. 405(a); *Pamela Taylor*, 2014 WL 4922629, at *45-46. Moreover, after Defendant denied threatening to kill Detective Lockhart, the trial court permitted the State to introduce extrinsic evidence to prove that this specific act took place, which is not permitted under the Rules of Evidence. *See* NEIL P. COHEN ET AL., TENNESSEE LAW OF EVIDENCE § 405.3; *State v. Jennie Bain Ducker*, No. 01C01-9704-CC-00143, 1999 WL 160981, at *23 (Tenn. Crim. App. Mar. 25, 1999); *aff'd State v. Ducker*, 27 S.W.3d 889 (Tenn. 2000). We conclude, therefore, that the trial court erred but that the error was harmless.

When questioned by the State, Defendant acknowledged that he broke the windshield on the victim's car and clarified that the victim was not in the car and that she hit him with a rock first. Defendant also denied ever threatening to kill Mr. Kendall and Detective Lockhart. Defendant testified fully about his relationship with the victim and the victim's threatening and violent conduct. He testified that, on the evening of the offense, the victim was the initial aggressor and came at him with a knife, that he feared the victim was going to stab him, and that he was, therefore, acting in self-defense at the time of the offense. Defendant also introduced medical records, expert testimony, and additional witnesses who testified about the victim's mental health and other violent incidents in which the victim acted as the aggressor. Moreover, as discussed more fully below, the proof overwhelmingly supports Defendant's conviction for second degree murder and the jury's rejection of his claim of self-defense. Defendant has not shown that the error "more probably than not affected the judgment or would result in prejudice to the judicial process." *See* Tenn. R. App. P. 36(b); *State v. Rodriguez*, 254 S.W.3d 361, 372 (Tenn. 2008). Accordingly, under the facts of this case, Defendant is not entitled to relief.

### *Sufficiency of the evidence*

Defendant contends that the evidence is insufficient to support his conviction. The State responds that, when viewed in the light most favorable to the State, the evidence is sufficient for a rational trier of fact to find Defendant guilty of second degree murder beyond a reasonable doubt.

Our standard of review for a sufficiency of the evidence challenge is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original); *see also* Tenn. R. App. P. 13(e). Questions of fact, the credibility of witnesses, and weight of the evidence are resolved by the fact finder. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh the evidence. *Id.* Our standard of review "is the same whether the conviction is based upon direct or circumstantial evidence." *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)) (internal quotation marks omitted).

A guilty verdict removes the presumption of innocence, replacing it with a presumption of guilt. *Bland*, 958 S.W.2d at 659; *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). The defendant bears the burden of proving why the evidence was insufficient to support the conviction. *Bland*, 958 S.W.2d at 659; *Tuggle*, 639 S.W.2d at 914. On appeal, the "State must be afforded the strongest legitimate view of the evidence and all reasonable inferences that may be drawn therefrom." *State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007).

As relevant here, second degree murder is "[a] knowing killing of another[.]" Tenn. Code Ann. § 39-13-210(a)(1) (2014). Second degree murder is a "result of conduct" offense. *See State v. Brown*, 311 S.W.3d 422, 431-32 (Tenn. 2010); *State v. Ducker*, 27 S.W.3d 889, 896 (Tenn. 2000). Accordingly, the appropriate statutory definition of "knowing" in the context of second degree murder is as follows: "A person acts knowingly with respect to the result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result." Tenn. Code Ann. § 39-11-302(b) (2014); *see Brown*, 311 S.W.3d at 431.

When viewed in the light most favorable to the State, the evidence supports Defendant's second degree murder conviction. On the evening of the offense, Defendant and the victim had been arguing about Defendant's pills and his wanting to leave Mr. Kendall's residence. The victim did not want Defendant to leave and pushed Defendant as he attempted to walk by her in Mr. Kendall's kitchen. Defendant looked for a knife and found one in the sink. He then stabbed the victim twice in the back. After stabbing the victim, Defendant placed the knife in a drawer. He did not attempt to provide the victim aid, and he immediately left the scene. Dr. Deering testified that the stab wound to the middle of the victim's back fractured a rib and cut through her aorta, resulting in her death. Detective Lockhart testified that no weapons were found in the area where the victim was stabbed and collapsed. The jury was instructed on Defendant's claim of self-defense, but the jury clearly discredited Defendant's testimony that he was acting in self-

defense as was its prerogative. The evidence is sufficient to support Defendant's conviction for second degree murder.

Defendant argues that his conviction was based solely on the wrongfully admitted evidence of his prior violent acts. However, "[t]he sufficiency of the convicting evidence must be examined in light of all the evidence presented to the jury, including that which is improperly admitted." *State v.* Long, 45 S.W.3d 611, 619 (Tenn. Crim. App. 2000) (internal citation omitted). Thus, even if the evidence was admitted in error, it does not affect this court's sufficiency analysis. Defendant is not entitled to relief.

## Conclusion

For the aforementioned reasons, the judgment of the trial court is affirmed.

_____
ROBERT L. HOLLOWAY, JR., JUDGE